MARGARET A. ALLEN v. MILES & ADAMS et al.

1. HUSBAND AND WIFE: LIABILITY OF HUSBAND TO ACCOUNT FOR THE SEPA-
   RATE ESTATE OF THE WIFE.—Agreements between husband and wife in relation
   to her separate estate, held under the Act of 1846, and which are injurious to
   the wife and beneficial to the husband, will not be presumed ; but every reason-
   able intendment will be indulged to the contrary ; and hence the husband
   will be held liable to account to the wife for both the principal, and income of
   such estate, which he has applied to his own use during the coverture, unless
   it appear affirmatively that the wife intended that he should take it as a gift.
2. PROBATE COURT: PRACTICE: REFEREES.—The Court of Probates may, upon
   overruling exceptions filed to a claim allowed in the report of a commissioner
   of insolvency, appoint their referees to examine into its validity. See Rev.
   Code, p. 449, Art. 101.

APPEAL from the Court of Probates of Yazoo county.   Hon. R.
B. Mayes, judge.

The estate of Henry Allen, Jr., was declared insolvent, and the
commissioner of insolvency reported, among other claims allowed
by him against the estate, a claim in favor of Mrs. Margaret A.
Allen, amounting to $6717 96, credited by $900 for her personal
expenses.

On the coming in of this report, Miles, Adams & Co. and several
other creditors of the decedent, whose claims had also been allowed,
excepted to it, on the ground of the allowance of the account in
favor of Mrs. Allen.

The exceptions were overruled by the court, and Miles, Adams
& Co. and the other creditors objecting with them, moved the court
to refer the same to referees, the motion was sustained, and the
exceptions were referred to three referees named by the court, and
Mr. Allen excepted.

These referees afterwards reported, disallowing all of Mrs.
Allen's account, except the sum of $3000, given to her by her
father on her marriage.

Mrs. Allen and the creditors both excepted to this report, and
the court then referred the exceptions to Walker Brooke, A. P.
Hill, and J. L. Deason ; and Mrs. Allen again excepted.

These last-named referees made their report, allowing two items

of Mrs. Allen's account, viz., the item of $3000 received from her father, and interest on the same, and the item of $271 44, paid by her on execution against the estate.

Mrs. Allen and the creditors both filed exceptions to the report, which were overruled, and the report confirmed; from which decree all the parties have appealed.

The account presented by Mrs. Allen is as follows:

1854, April.　　　Henry Allen, deceased,
　　　　　　　　　　To Mrs. M. A. Allen, Dr.

| | |
|---|---:|
| 1. To money of my separate estate, received from me, | $3000 00 |
| 2. To labor of three slaves (naming them) from April, 1854, to January, 1855, | 300 00 |
| 3. To hire of three negroes, received by you from R. S. Bowles, in 1855, | 550 00 |
| 4. To net proceeds of fifty-five bales of cotton, sold by Brady, Gorman & Co., | 1996 00 |
| 5. To labor of three women and three boys, in making cotton sold to Miles, Adams & Co., | 600 00 |
| 6. To amount of execution of Cusacks & Hill against you, paid by me, | 271 00 |
| | $6717 94 |
| Cr.　By amount on account of personal expenses of Mrs. M. A. Allen, from April, 1854, to October, 1856, | 900 00 |
| | $5817 94 |

Henry Vaughan, a witness for Mrs. Allen, stated that the deceased and Mrs. Allen were married in this State, in 1854, and they resided here until Allen's death, in October, 1856. Mrs. Allen received from witness (who is her father) $3000, a few days after her marriage. Witness advised her to place it in possession of her husband to purchase servants. No servants were ever bought by Allen. About October of that year (1854), Allen told witness that he had loaned out a part of the money in Grenada. Witness is administrator of Allen, and has found no note or other

evidence of debt among his papers, which seemed to be for loaned money.

Mrs. Vaughan (mother of Mrs. Allen) stated that she heard Allen say, about 1st October, 1854, that he had loaned out $3000 of his wife's money.

In reference to the second item in the account, Henry Vaughan, further testifying, stated that Mrs. Allen, soon after the marriage, carried from witness's house the slaves mentioned in said item; and Allen told witness that he had them employed on his plantation, from about 1st May until the end of the year.

The bill of exceptions then recites, "that it is admitted that the second, third, and fourth items of the account are correct as charged; that the negroes mentioned were the separate property of Mrs. Allen, and the cotton therein named was the product of the labor of said negroes; and that the proceeds of said cotton were received by Allen, and the services of the negroes, as charged in the account, were received and enjoyed by him. It is also admitted that Allen had the possession, charge, and management of the separate property of Mrs. Allen, as her husband, without any special agreement."

In reference to the sixth item in the account, Henry Vaughan stated that the sheriff had an execution in his hands against Allen, for $271 44, and was about to levy it on property of the estate. Witness advised Mrs. Allen to pay it, and prevent a sacrifice of the property. This was before the estate was administered, and before its condition was known.

Mrs. Allen was offered as a witness, but was objected to as incompetent. This objection was overruled, and she testified in substance the same as Vaughan; and further, that she had loaned Allen the $3000 claimed.

It was admitted that no part of the account had been paid. It does not appear from the record whether Allen and wife lived together, or whether Allen maintained and supported Mrs. Allen during coverture.

*R. S. Holt,* for Mrs. Allen.

By the fourth section of the Act of 1846, the products and pro-

ceeds of the labor of all slaves owned by a married woman in her own right, "inure to her sole and separate use and benefit."

Such products and proceeds are by this act placed upon the same footing as the negroes themselves. Her title to the negroes, and the products of their labor, is declared and established by precisely the same legislative authority and sanction.

Under this provision of the Act of 1846, Mrs. Allen claims to sustain her charges for hire and the proceeds of cotton made by her negroes.

Can she in law do so?

The proposition mainly relied on in opposition is, that if a married woman suffers her husband to receive the products of her separate property, she is in law presumed to have intended it as a gift to him, and she cannot compel him to account.

In support of this position, many ancient English chancery decisions are cited, in cases in which the separate property of the wife was vested in trustees, by deed or will, and in which, by the consent of the wife, the husband had for a long period been permitted by her to receive the profits of her estate, and in which the chancellor held, that by this reception of profits by the husband, by the wife's consent, proved as matter of fact to his satisfaction, that the wife had given such profits to her husband. And this forced, unfair, and unfounded inference of fact is expressly put upon the ground, that the law leans against the existence of a separate estate in the wife; or because, as one learned chancellor expressed it, it was "against natural right that a wife should have a separate estate." This class of cases is thoroughly reviewed and collected by Chancellor Kent, in 3 John. Ch. R. 89. The law deducible from them is also stated in Clancy on Married Women, 350–354; and the referees are cited to these authorities as stating in full the ancient English doctrine on this subject.

Even as thus stated it has not been steadily adhered to. 9 Ves. Jr. 582; 1 John. Ch. R. 456; Freeman's Ch. R. 348.

In reply to this position we answer,—

1. That if the inference of the English chancellors, of a gift by the wife to the husband, drawn from the single fact of her permitting him to receive the profits of her separate estate, was an inference of fact from testimony, these cases constitute no authority

in this case, as each court must draw its own inferences from the testimony before it in each case, and no one, under our laws and view of our social usages, could for a moment draw such a conclusion from such a fact alone.

2. If from the reception of the profits of the wife's property, by the husband, with her consent, the English law presumed a gift by her to him, then the authorities cited show conclusively, that this presumption was founded solely in what was called the leaning of the law against a separate estate in the wife, in the then policy of the law against her claim to a separate property, in the idea that it was "against natural right" that she should own property in her own right.

Under our laws, there is no such leaning of the law against the wife, no such policy adverse to her right to hold property; but we have reversed this leaning and policy of the English law; and must not this reversal of policy he held to have abrogated the legal inference founded solely on the legal policy thus abrogated? The foundation is swept away, and the superstructure must fall. The principles of the English system can be received as in force here, only so far as they are consistent with our statutory laws and social and legal policy.

The establishment of such a legal principle as that contended for here, would work the greatest injustice to married women, because, according to our social usages, the husband universally manages his wife's estate, and must always do so, and in doing so uniformly receives the products of it. Such products are always understood to be received by him as agent or trustee, and in either capacity he must account.

3. But even the authorities relied on upon the other side require, to the legal presumption, that the husband should continue to receive the profits of his wife's estate for a long period. No instance could perhaps be found of a continuance of this course for only twelve or eighteen months, as in this case, having been held sufficient.

4. The payment referred to in the last item of the account was voluntary, it is true, but it was made for the benefit of the estate, and justice requires its allowance.

Can it be sustained in law? We think so, and upon obvious grounds.

By paying a debt of the estate, Mrs. Allen became executrix *de son tort.* 1 Lomax on Ex. 76.

Being executrix *de son tort*, our Supreme Court have held that she may claim, and can only claim, as a creditor at large of the estate to the extent of such payment.

*George B. Wilkinson* and *E. Bowman*, for appellees.

Two questions are presented by the record.

First. Whether the court could legally appoint referees, after the overruling of the exceptions to the report of the commissioners of insolvency.

Second. As to the validity of the claim of the appellant, Margaret A. Allen, against her deceased husband's estate.

Upon the first point, we think the words of the statute are clear and explicit, in favor of the appointment of the referees. Code, p. 449, Art. 101. "Any creditor" may object to the allowance of any claim, " and in case any such objection be made," the court shall appoint referees on the claim of either party, whose report shall be final, unless set aside for good cause shown; in which case a new reference shall be made.

Upon the second point, we think it well settled, that, although a wife may have a separate estate from the husband, and may have a decree against him, in respect to such estate, yet, if she do not demand the produce during his lifetime, and he maintain her, an account of such separate estate shall not be carried back beyond the year in which he died. *Methodist Episcopal Church* v. *Jacques*, 3d Johnson's Ch. Rep. 86–114, in which all the authorities are reviewed; 2 Story's Eq. 604, and authorities cited in *Moore's Ex'x* v. *Ferguson*, 2 Munford R. 421. See also authorities cited by first referees in their report.

The last referees allowed the amount paid on the judgment against Allen, under a mistake of facts. This judgment was not paid on the request of the administrator, but was paid before any administration, and cannot, therefore, be recovered. See authorities cited by first referees.

The proof shows that Henry Allen, Jr., died in October, 1856. It is not pretended that any of the rents and profits of his widow's estate, now claimed against his estate, are for the year in which he died. We think, therefore, her claim should be disallowed. ·And

the court should decree a division of the amount among the creditors who have objected to her claim, and not all the creditors of Allen's estate.

Harris, J., delivered the opinion of the court.

This cause comes before us on appeal and cross-appeal from the decision of the Court of Probates, on the report of the commissioner of insolvency on the estate of Henry Allen, deceased. Mrs. Allen filed her account against the estate of Henry Allen, Jr., deceased, her late husband, for money of her separate estate, received by him for the use of negroes on his plantation, for proceeds of the sale of cotton, and for an amount paid and advanced by her after Allen's death, on execution in the sheriff's hands, which was about to be levied on the property of the estate. The commissioner reported her claim, amounting in all to $6723 54, to the court for allowance. Exceptions were filed to the report and overruled by the court, and the claim allowed.

Referees were appointed to decide on the validity of said claim, and report their action to the court, who subsequently made the decision and report, which was objected to, and said report disallowed. And thereupon, other referees were appointed, who subsequently reported their decision; allowing the account of Mrs. Allen, except for the hire and use of her negroes. Nothing is said about the proceeds of the cotton charged in the account; but we regard this also as rejected, as the order of the court confirming this report, only mentions the sum of $3000, said to have been loaned out by the decedent, and the execution paid by Mrs. Allen after his death. Bills of exception are taken and filed by both parties, to the several orders and decrees of the court. And the two main questions for decision are, first, as to the appointment of referees; and second, as to the decree allowing part of the account, and rejecting the balance.

We think there was no error in the appointment of referees under the statute. The decision of the referees has no binding effect on the court; it is a mere report, subject to the rejection or confirmation of the court; and this reference is not, therefore, to be regarded as in the nature of an appeal, but an interlocutory order, directing further examination for the information of the court, pre-

paratory to its final decree. · There was, therefore, no error in the reference.

The main point, however, for our consideration, arises on the allowance and rejection of certain of the items of Mrs. Allen's account.

The record shows, that Mrs. Allen was married in this State to the said Henry Allen, Jr., now deceased, in the year 1854; that about three thousand dollars in money, the separate property of the wife, was placed by the wife in the hands of the husband, not for his use or as a gift from the wife, but for her benefit; that the said Allen, in his lifetime, stated that he had loaned all or the greater part of said sum at interest; and that at his death no note or other security was found among his papers for said amount. It further appears, that certain slaves, the separate property of the wife, were also used, from the month of May, 1854, to January, 1855, by the said Allen, and also for the year 1855; that the said decedent also sold, and received certain sums of money, the proceeds of cotton, raised by the negroes of said Margaret A. Allen; and lastly, that the said Margaret A., after the death of the said Henry Allen, advanced the sum of $271 44, to prevent the sale of decedent's property, under an execution against her estate, in the hands of the sheriff, and about to be levied on the property of the estate, to save it from sacrifice. These constitute the several items of the account, filed and allowed by the commissioners, and which are objected to, and made the subject of contest here.

It will be observed, that the record shows no agreement between the husband and wife, in relation to the use of her property. Nothing appears to induce the presumption that it was intended that the husband should appropriate the property of the wife or its proceeds, without account; unless the ancient rules of the common law of England, with all the rigor of its unreasonable dogmas against the rights, the interests, or the power of the wife, in the preservation of her separate estate, are to be regarded as still existing in this State, since the adoption of our Statutes of 1839 and 1846. As is most forcibly and ably argued by counsel for Mrs. Allen, these rules were originally founded in reasoning, or rather in assumptions, that have been long since discarded by the advancement of the age; "in what is called the leaning of the

law against separate estates in married women; in the cherished policy of the law against their claim to a separate estate; in the idea that it was against natural right, that they should own property in their own right." As in the case of *Powell* v. *Hankey*, 2 P. Wms. 82, when it was said, "every reasonable intendment was to be made against the wife, and her consent to her husband's receipts of her interests was to be presumed, and that he had received and lived upon it as a gift." And that it was "against common right that the wife should have a separate property from her husband; and therefore all reasonable intendments were to be admitted against her." Per Lord Macclesfield.

Chancellor Kent, after a thorough review of all this class of cases in England, says, "the leaning of the courts has been too much against the wife, and the presumption of her consent too freely given."

Veneration for the opinions and reasoning of the ancient fathers of our jurisprudence, is due alike to the authority of their great names, as to the learning, research, and wisdom, which usually marked their labors; and yet, to claim for their opinions infallibility or perfection, at its inception, would be as servile flattery to them, as unjust to the noble science they inaugurated.

Freedom of thought and freedom of opinion, have established an improved system of government, as well as an improved system of jurisprudence, in this country, as well as in England, the result and work of enlightened, unfettered reason; and the statesman or the jurist, who at this day plants himself upon a dogma of bygone years, for which he is unable to render a reason, has outlived the generation to which he properly belonged.

It is the peculiarity of the present age, that in judicial proceedings, form is giving place to substance; fiction to truth; the ancient fetters of case-hardened error, to the freer and safer limits of laborious study and thought, employed to discover, understand, and declare that "perfection of reason," which the common law is supposed to represent.

Chancellor Kent, in the *Methodist Episcopal Church* v. *Jacques*, 3 John. Ch. R. 92, says: "Such strong aversion to the wife's independent enjoyment of her separate estate, manifested so early in the history of the cases, may have given a permanent tone and

color to the doctrines of the court; and, perhaps, the language of these cases will not now be thought to be founded on equity and justice."

By the Act of 1839, in relation to the separate property of married women, the husband was allowed the use and enjoyment of the proceeds and income of the estate; but it was even then the policy of our law, instead of declaring it "against common right," to protect and preserve her separate estate, and all judicial intendments were indulged in favor of such policy. But since the passage of the Act of 1846, extending our policy in favor of married women, so as to secure to them the proceeds and income of their separate estate, the husband is entitled to no such presumptions as were formerly indulged by the English courts against the rights of the wife, but the courts of this State regard him as a trustee, and will hold him to strict accountability, according to the provisions and policy of our statutes.

"Where no trustee is appointed to take charge of the separate estate of the wife, the husband is regarded as a trustee for her; and if he, without her consent, appropriate to his own use her separate property, he is her debtor to that extent, and will be compelled by a court of equity to make ample indemnity to the wife, by a settlement to her use out of his own property." *Wiley & Co.* v. *Gray, ante,* p. 510.

We think it, therefore, consistent with the spirit and policy of our statutes in relation to the rights of married women, as well as the general doctrines of the law in relation to their incapacity to contract to their injury, except where specially provided for by law, to hold that contracts or agreements with their husbands, for the benefit of the husband, and to the injury and destruction of the wife's separate estate, will not be presumed; and that the courts will indulge every reasonable intendment to the contrary, in the absence of all evidence of any express agreement.

*Pennington* v. *Acker,* 30 Miss. R. 161, sustains this view.

Let the decree be reversed, so far as it disallows any part of the claims originally allowed and reported by the commissioner, and affirmed so far as it allows the amounts reported by the last referees, and let the cause be remanded for further proceedings.